Filed 11/5/15  P. v. Brewer CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER MICHAEL BREWER,<br><br>    Defendant and Appellant. | 2d Crim. No. B257185<br>(Super. Ct. No. 1358729)<br>(Santa Barbara County) |

Christopher Michael Brewer appeals a judgment following conviction of second degree murder (count 1) and dissuading a witness by force or threat (count 2), with findings that he personally used a deadly weapon, committed the crimes to benefit a criminal street gang, and served a prior prison term.  (Pen. Code, §§ 187, subd. (a), 189, 136.1, subd. (c)(1), 12022, subd. (b)(1), 186.22, subd. (b)(1), 190.2, subd. (a)(22), 667.5, subd. (b).)[1]  We affirm.

*FACTUAL AND PROCEDURAL HISTORY*

In the late afternoon of December 9, 2011, Brewer stabbed Alberto Diaz, Jr. in the neck, severing a major blood vessel.  The stabbing occurred outside the Santa Maria Budget Inn motel.  Diaz stumbled a short distance near a fast-food restaurant

---

[1] All statutory references are to the Penal Code unless stated otherwise.

before collapsing.  A restaurant employee summoned emergency medical assistance, but Diaz soon died from his stab wound.

*Circumstances of the Murder and its Aftermath*

*(Count 1)*

In December 2011, Patricia Perez lived with Brewer's brother, Jacob Brewer, at the Budget Inn.[2]  Brewer also stayed at the motel from time to time, but in a different room.

Diaz, whose moniker was "Stormy," was a criminal street gang member known for his violence and "having chaos around him."  Diaz was in trouble with his street gang, "Surenos," and had a "green light" or "hit" ordered against him by the gang hierarchy.

In the afternoon of the murder, Diaz and his friend, David Padilla, rode their bicycles to the motel and walked to Perez's room.  Perez, Gabriel Almaguer, and Jacob were in the room.  Perez recommended that Diaz and Padilla leave because she did not want "trouble."

Almaguer quietly asked Perez if Diaz was "Stormy."  Perez confirmed Diaz's identity.  Almaguer wanted "to approach" Diaz, but Perez warned Almaguer that she did not want "anything like that going down in [her] room."  Almaguer and Jacob then left, followed by Diaz and Padilla a few minutes later.

Almaguer and Jacob entered Brewer's room and informed him and Rudy Ramos that "Stormy" was in the motel.  Brewer asked for a "blade," and Almaguer gave him a three-inch folding knife.  When Almaguer realized that his fingerprints were on the knife, he asked Brewer to return it.  Brewer replied, "Don't trip.  I got this, my boy."

Almaguer left the room to smoke a cigarette.  Brewer, Ramos, and Jacob also left the room and walked across the parking lot.  Diaz and Padilla had retrieved their bicycles and were riding away.  Brewer called out to Diaz, "Hey, what's up, homie?"  Diaz turned around and rode his bicycle toward Brewer.  As Diaz approached, Brewer

---

[2] We shall refer to Jacob Brewer as "Jacob," and Christopher Brewer as "Brewer," not from disrespect, but to ease the reader's task.

drew the knife and stabbed him in the neck. Brewer and the others then ran away. Diaz called out, "He got me, he stuck me."

Jessica Manna was walking to the motel to visit her aunt, Stacy Hamrick, who was the motel manager. Manna saw Diaz clutch his chest and fall to the ground. Jacob then ran past Manna and Hamrick. In response to their questions regarding Diaz, Jacob stated, "You didn't see nothing. Nothing happened." Jacob went into a nearby room and shut the door.

Diaz stumbled a short distance and collapsed near a fast-food restaurant. A restaurant customer attended to him, but found him unresponsive. An employee summoned emergency medical assistance and rendered first aid until paramedics arrived. Diaz died at the hospital shortly thereafter.

In the days following the murder, police officers spoke with Brooke Cummings, Brewer's girlfriend, at her home. The interview was recorded. Cummings stated that during the evening of the murder, Brewer stayed with her. She also saw and spoke to him at times for several days thereafter. Brewer admitted to Cummings that he had "murdered" someone and was "in some deep shit." He also stated that he did not care, and that Diaz was "stupid" and "nobody gives a shit about him." Brewer added that Diaz "had it coming." He denied killing Diaz in self-defense: "[I]t wasn't self defense. I murdered him."

Cummings also informed police officers that Brewer, at times during their relationship, had discussed his criminal street gang involvement. He said his involvement was "really deep," but sometimes professed a desire to leave the gang. Cummings identified Brewer's gang as "Surenos Guad."

At trial, the prosecutor played the recording of Cummings's interview with police officers.

*Expert Witness Gang Testimony*

Santa Maria Police Detective Michael Parker was assigned to gang suppression detail. Parker was familiar with the "Guada" and Sureno criminal street gang members and the victims of their crimes, having spoken to or arrested hundreds of gang

3

members. He testified that a "green light" is "an open invitation for any gang member who falls under the Sureño [gang] umbrella to take action [against a rule breaker]."

Parker opined that Diaz was a member of the Guada and Sureno criminal street gangs, based upon his self-admissions and prominent facial tattoos declaring his gang affiliation. Informants had reported to police officers that Diaz was the subject of a green light order from the gang hierarchy and had been targeted for assault.

Parker also opined that Brewer was a member of the Guada and Sureno criminal street gangs. Parker rested his opinion in part upon an incident where Brewer wrote gang graffiti on a school wall; Brewer's admission in a 2009 probation report that he associated with Guada gang members; Brewer's admissions to jail housing deputies; and a statement by another brother, David Brewer, that Christopher was a Guada gang member.

Based upon a hypothetical similar to the circumstances of the present crime, Parker opined that Diaz's murder benefitted the Guada criminal street gang because it instilled community fear and increased the reputation of the gang member who killed Diaz.

*Defense Evidence*

Gregorio Estevane, a licensed private investigator, testified as a defense expert witness regarding gang murders in Sureno criminal street gangs. Estevane opined that Brewer was not an active member of any street gang, based in part on Brewer's statement reported in the 2009 probation report. He also stated that it was not likely that Diaz would have been alive had a green light been ordered against him several years before. Estevane opined that Brewer's flight following the stabbing does not imply that he was a gang member or that the crime was committed to benefit a criminal street gang.

Brewer testified that he was "in and out" of the Budget Inn, used methamphetamine daily, and sold drugs that were given to him by Ramos. Brewer denied that he belonged to any criminal street gang or that he committed any gang-related crimes.

4

Brewer testified that in the afternoon of the murder, he heard Diaz outside the motel speaking in an angry voice. Brewer took Almaguer's knife because he was frightened. Brewer left his room and walked away to avoid a confrontation with Diaz.

As Brewer was leaving the area, Padilla asked for a cigarette. Diaz then approached Brewer and appeared angry. Diaz demanded that Brewer look at him and pay attention to him. Brewer believed Diaz's behavior was threatening. When Diaz "reach[ed]" toward Brewer, Brewer swung the knife at Diaz. Brewer then ran and discarded the knife. Brewer testified that he did not intend to kill Diaz and did not weigh the consequences of his actions beforehand.

Psychologist Marianne Davis reviewed Brewer's criminal and mental health records and interviewed him and his mother. Davis opined that Brewer suffers from post-traumatic stress disorder, bipolar disorder, and methamphetamine and cannabis abuse. These afflictions, she opined, might cause him to overreact or misperceive an act as threatening.

Brewer also informed Davis that he was in good standing with a criminal street gang but was not affiliated with the gang. She testified that she believes that he minimizes his gang involvement.

*Dissuading a Witness*

*(Count 2)*

During his confinement in county jail, Brewer telephoned his friend, Angelina Tejeda. In a recorded telephone conversation on January 20, 2012, Brewer stated that "both the girls" were "ratting on [him]," and that he thought "Brooke's gonna testify in court." Brewer stated that he "should slap that bitch" and instructed Tejada, "If you ever see her, tell her I said 'Hi.' You know what I mean. . . . [T]hat kind of a 'Hi.'" At trial, the prosecutor played a recording of the jail conversation with Tejada.

Detective Parker testified that Tejada was an admitted member of the Northwest criminal street gang. She also had several gang-related tattoos declaring her affiliation.

5

*Conviction and Sentencing*

The jury convicted Brewer of second degree murder (count 1) and felony dissuading a witness by force or threat (count 2), and found that he personally used a deadly weapon regarding the murder, committed the crimes to benefit a criminal street gang, and served a prior prison term. (§§ 187, subd. (a), 189, 136.1, subd. (c)(1), 12022, subd. (b)(1), 186.22, subd. (b)(1), 190.2, subd. (a)(22), 667.5, subd. (b).)[3] The trial court sentenced Brewer to a prison term of 24 years to life; imposed a $10,000 restitution fine, a $10,000 parole revocation restitution fine (stayed), a $80 court security assessment, and a $60 criminal conviction assessment; and, awarded Brewer 880 days of presentence actual custody credit. (§§ 186.22, subds. (b)(4)(C) & (b)(5) [minimum parole eligibility], 1202.4, subd. (b), 1202.45, 1465.8, subd. (a); Gov. Code, § 70373.)

Brewer appeals and contends that: 1) the trial court erred by permitting the prosecution gang expert witness to testify with testimonial hearsay evidence; 2) insufficient evidence supports his conviction of count 2, felony dissuading a witness; and, 3) the gang-affiliation questions posed to him during the booking process are inadmissible pursuant to *People v. Elizalde* (2015) 61 Cal.4th 523, 527.

*DISCUSSION*

*I.*

Brewer argues that the trial court erred by permitting the prosecution gang expert witness to testify with testimonial hearsay evidence in violation of the Sixth Amendment. As an example, he points to Parker's testimony that Brewer introduced himself as "Boogie from Guada" to his gang member cellmate, and stated that he killed Diaz who was "a disgrace." The jail cellmate relayed this information to police officers during a recorded interview. Brewer correctly asserts that although he did not object to Parker's testimony on Sixth Amendment grounds, an objection would have been futile. (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210 [Sixth Amendment confrontation

---

[3] Codefendants Jacob and Almaguer pleaded guilty prior to trial which then proceeded against Brewer and Ramos. The jury acquitted Ramos of all charges.

clause not implicated where prosecution gang expert bases his opinion on hearsay information in police reports and interviews with gang members].

The admission into evidence of a testimonial hearsay statement by a declarant who is not available at trial violates the confrontation clause of the Sixth Amendment unless the criminal defendant had a prior opportunity to cross-examine the declarant.  (*Crawford v. Washington* (2004) 541 U.S. 36.)  But "the [Confrontation] Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'"  (*Williams v. Illinois* (2012) – U.S. – [132 S.Ct. 2221, 2224] [plur. opn. of Alito, J., joined by Roberts, C.J., Kennedy & Breyer, JJ.], quoting *Crawford*, p. 59, fn. 9.)

In California, an expert witness may testify "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ."  (Evid. Code, § 801; *People v. Gardeley* (1996) 14 Cal.4th 605, 617-620.)  Thus, an expert witness regarding criminal street gangs may base his opinion upon conversations with gang members, information gathered by other law enforcement officers, his own personal investigations, or other information. (*Gardeley*, at p. 620.)  "A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 949.)

Brewer acknowledges that his confrontation clause argument is contrary to *People v. Gardeley*, *supra*, 14 Cal.4th 605, 617-620.[4]  We are bound by that decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  The recent United

---

[4] Our Supreme Court is considering whether a defendant's Sixth Amendment right to confrontation is violated by a gang expert's reliance on testimonial hearsay.  (*People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, No. S216681;  *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640.)

States Supreme Court decision in *Williams v. Illinois*, *supra*, - U.S. - [132 S.Ct. 2221] had no majority opinion and the outcome found no constitutional violation. We thus reject Brewer's Sixth Amendment contentions.

*II.*

Brewer contends that insufficient evidence supports his conviction of felony dissuading a witness by threat or force. (*People v. Young* (2005) 34 Cal.4th 1149, 1210 ["The crime of intimidating a witness requires proof that the defendant specifically intended to dissuade a witness from testifying"].) He asserts that the evidence merely establishes his anger toward Cummings, or a suggestion that Tejada speak to Cummings if Tejada "ever" saw her.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (2015) 60 Cal.4th 966, 988; *People v. Jackson* (2014) 58 Cal.4th 724, 749.) Our review is the same in a prosecution primarily resting upon circumstantial evidence. (*Johnson*, at p. 988; *People v. Watkins* (2012) 55 Cal.4th 999, 1020.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young*, *supra*, 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact"].) We must accept logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.)

Section 136.1, subdivision (a)(1) punishes a person who "[k]nowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial . . . ." Section 136.1, subdivision (c)(1) punishes the crime as a felony if the act "is accompanied by force or by an express or implied threat of force or

8

violence, upon a witness . . . ." There is no talismanic requirement that a defendant utter the words, "Don't testify," to commit the offense. (*People v. Thomas* (1978) 83 Cal.App.3d 511, 514.) The crime is committed upon proof that a defendant's words or actions support the inference that he sought to prevent or dissuade, by an express or implied threat of force or violence, a potential witness from attending trial. (*Ibid.*)

Sufficient evidence and reasonable inferences therefrom establish that Brewer attempted to dissuade Cummings's testimony by an implied threat of force or violence, within section 136.1, subdivisions (a) and (c). During the jail conversation, Brewer acknowledged that Cummings had spoken with police officers ("ratting on [him] right now") and would testify against him at trial. Brewer knew that he had made damaging statements to Cummings that would implicate him in the murder of Diaz, weaken his theory of self-defense, and support his involvement in a criminal street gang. Tejada was an admitted member of the Northwest criminal street gang and had gang tattoos. The prosecutor played a recording of the jail conversation at trial, and the jury heard the nuances and inflections of Brewer's voice. The jury was free to interpret the words spoken from the surrounding circumstances of the case. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1341.)

### III.

Brewer argues that his answers to the gang-affiliation questions posed to him during past and present police booking procedures are inadmissible pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, 478-479 ("*Miranda*") and the recent decision in *People v. Elizalde*, *supra*, 61 Cal.4th 523, 527 ("*Elizalde*"). He claims the error contributed to the guilty verdict because the booking evidence is "compelling" compared to the "disconnected scraps" of other evidence regarding his gang affiliation.

*Elizalde* considered whether a defendant's answers to booking questions regarding gang affiliation are admissible in the prosecutor's case-in-chief. "Here we consider whether routine questions about gang affiliation, posed to defendant while processing him into jail on murder charges, come within *Miranda's* well-recognized booking exception. We hold that the questions exceeded the scope of the exception and

9

that officers should have known these questions were reasonably likely to elicit an incriminating response because of California's criminal gang statutes and defendant's pending charges. While officers were permitted to ask these questions for institutional security purposes, defendant's un-*Mirandized* responses were inadmissible against him during the case-in-chief." (*Elizalde*, *supra*, 61 Cal.4th 523, 527.)

The erroneous admission of a defendant's booking statements obtained in violation of the Fifth Amendment is reviewed for prejudice pursuant to the reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18. The test requires the People to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict. (*Elizalde*, *supra*, 61 Cal.4th 523, 542.)

*Elizalde* concluded that the application of *Miranda* to admissions of gang membership made in response to booking questions depends in part on the crimes for which the defendant was arrested. (*Elizalde*, *supra*, 61 Cal.4th 523, 534 [in California, gang membership often has penal consequences].) The record here does not contain complete information regarding Brewer's earlier arrests and bookings during which he admitted gang association or membership. For purposes of argument, we will assume that the booking officers could reasonably have expected to elicit responses that could be used against Brewer in a criminal proceeding. (*Elizalde*, at p. 527.)

Any error here is harmless because Brewer's criminal street gang membership was established beyond a reasonable doubt by other evidence. Brewer admitted to a probation officer that he wrote gang-related graffiti on a high school wall in 2007. During a field interview in 2007, Brewer admitted that he was a member of the Guadalupe criminal street gang. In 2009, Brewer admitted to a probation officer that he associated with the Guadalupe gang. David Brewer informed Detective Parker that his brothers Christopher and Jacob were gang members. Brewer appeared in a video recording, played for the jury, asking "How's the G-life in Guada?" Parker testified that "G-life" means "gangster life." Brewer also sent a text message to "L'il Clowner" two days following Diaz's murder, stating, "Stay G." Brewer selected "BrewBooG13" as his email address. Parker testified that "Brew" indicated Brewer's name, "Boo" indicated his

10

moniker, "Boogie," and G13 indicated his gang. Brewer's girlfriend informed police officers that he was deeply into his gang but spoke of leaving it. Brewer also admitted to Doctor Davis that he was in good standing with his gang. Finally, Parker opined that Brewer was a gang member based upon a review of police files and probation reports, among other evidence. (*Elizalde*, *supra*, 61 Cal.4th 523, 542 [police officer expert witness opined that defendant was a gang member].) This evidence establishes that the jury would have reached the same conclusions absent evidence of Brewer's answers to booking questions. (*Ibid.* [application of *Chapman* harmless error test].)

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P. J.

We concur:


YEGAN, J.


PERREN, J.

11

Rick Brown, Judge

Superior Court County of Santa Barbara

_____


Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Timothy M. Weiner, Deputy Attorney General, for Plaintiff and Respondent.