Filed 6/25/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S215260 |
| v. | ) | |
| | ) | Ct.App. 1/2 A132071 |
| GAMALIEL ELIZALDE et al., | ) | |
| | ) | Contra Costa County |
| Defendants and Appellants. | ) | Super. Ct. No. 050809038 |
| _____ | ) | |

Under the rule of *Miranda v. Arizona* (1966) 384 U.S. 436, 478-479 (*Miranda*), certain admonitions must be given before a suspect's statement made during custodial interrogation can be admitted in the prosecution's case-in-chief. Here we consider whether routine questions about gang affiliation, posed to defendant while processing him into jail on murder charges, come within *Miranda*'s well-recognized booking exception. We hold that the questions exceeded the scope of the exception and that officers should have known these questions were reasonably likely to elicit an incriminating response because of California's criminal gang statutes and defendant's pending charges. While officers were permitted to ask these questions for institutional security purposes, defendant's un-Mirandized responses were inadmissible against him during the case-in-chief. We nonetheless find that admission of the statements was not prejudicial. Accordingly, we affirm the judgment of the Court of Appeal, which reached the same conclusions.

1

# I. BACKGROUND

Defendant Jose Mota-Avendano[1] was convicted of murdering Antonio Centron, Luis Perez, and Rico McIntosh on theories of conspiracy and aiding and abetting, along with other charges and enhancements. Briefly, the facts supporting his convictions are as follows:

Varrio Frontero Loco (VFL) is a subgroup of the Sureño criminal street gang and is active in Contra Costa County. Three witnesses who knew Mota testified he belonged to VFL. Robert Brady, a San Pablo police officer and street gang expert, also opined that Mota was a VFL member.

In 2007, Gamaliel Elizalde rose to power in VFL when another leader fled after committing a murder. Thereafter, the VFL organization began to deteriorate. To reestablish its position, Elizalde directed several members to "put in more work" by assaulting Norteños to let them "know we around, we ain't gone." Mota and four others were put in charge of the gang's efforts. Violence was an important part of enhancing the gang's standing because it helped garner respect, money, and new members. Elizalde directed VFL associate, Oscar Menendez, to beat up or shoot Norteños. Mota told Menendez that he had to "earn" a VFL tattoo by doing something "big" like killing a Norteño.

On December 22, 2007, VFL members Jorge Sanchez, Francisco Romero, and Hector Molina drove to San Pablo planning to beat or shoot Norteños. They saw three men walking down the street, two wearing the Norteño color, red. Molina hid behind a fence. When the three men rounded the corner, Molina

---

[1] The trial involved charges against Mota-Avendano (hereafter Mota or defendant), Gamaliel Elizalde, and Javier Gomez. Elizalde was the lead defendant in the appeal below. Only Mota's appeal is before us.

identified himself as VFL and shot at them repeatedly. Antonio Centron was killed; the other two men were wounded but survived.

On February 16, 2008, Mota and other VFL members drove around gang territory in two cars. The car carrying Mota stopped near Luis Perez, who was standing on the street dressed in a red jacket. After the men in the car argued with Perez, Jorge Camacho fatally shot him.

On April 26, 2008, Mota was in Norteño territory with Menendez and Javier Gomez. Mota pulled the car he drove alongside Rico McIntosh, who was wearing a red bandana. Gomez asked McIntosh if he was a "buster." McIntosh replied, "what the fuck is a buster?" and reached into his jacket. Menendez thought he heard Mota say, "pull it out." Gomez drew a gun and shot at McIntosh several times; Mota and Gomez laughed. McIntosh died the next day.

Mota was convicted of three first degree murders and of conspiracy to participate in a criminal street gang[2] and to commit murder and assault with a deadly weapon. The jury found true several street gang enhancements[3] and an enhancement for intentionally discharging a firearm causing great bodily injury or death. Mota was sentenced to 100 years to life in prison.

## II. DISCUSSION

A. *Proceedings Below and Standard of Review*

Before trial, Mota moved to exclude his admissions of gang membership during booking and classification interviews at a Contra Costa County jail. Inmates are typically asked three questions during intake: if they have been to the unit before, if they have a gang affiliation, and if they are fearful for their safety.

---

[2] Penal Code, section 182.5. All further statutory references are to the Penal Code.
[3] Section 186.22, subdivision (b)(1).

A classification interview is conducted for all gang-affiliated inmates. Before placement, personnel review an inmate's pending charges, gang affiliation, and need for protective custody. The review is conducted to maximize the safety of all inmates and jail employees. Rival gang members are housed separately.

After Mota's arrest and before he received *Miranda* admonitions, a sheriff's deputy asked him the standard booking questions. Mota admitted he was a Sureño gang member. When told he would be searched for contraband, Mota laughed nervously and said, "man, I'm in here for some shit that I didn't do. They said that I killed someone, but it wasn't me. I was there, but I didn't kill anyone. The guy that did it is already in jail. He confessed already, but now he is trying to bring me down, too[.]" He also said: "I'm a gang-banger, but I'm not a murderer[.]" He continued: "I told those other cops that I didn't know anything because I thought I would be in trouble, but now I don't care[.]" The deputy asked Mota if he wanted to speak with a police detective. He replied, "Yeah, I will, but first I should talk to my lawyer. After I talk to him I will tell you guys what really went down[.]" The deputy wrote a report summarizing the conversation to assist the San Pablo police investigation.

Subsequently, Deputy Bryan Zaiser of the classification unit interviewed Mota using a standard questionnaire. He did not advise Mota of his rights to silence and counsel. Nor did he say that Mota was required to answer the questions or threaten repercussions if he refused. Zaiser typically told inmates that the interview was "for their housing." He knew Mota had been charged with murder, but did not know if the crime was gang related. Zaiser's goal was to ensure the safety of jail inmates and personnel, not to investigate the charges. Asked about his gang affiliation, Mota responded that he was "affiliated with the Sureño street gang," specifically VFL, and that he was an active gang member.

4

The trial court held Mota's statements about his gang membership were admissible. It reasoned that "the sole purpose of this interview and the form is to ensure the safety of inmates and staff at the county jail. The information gathered is essential to maintain security at the jail. [¶] . . . [I]f the jail were to house rival gang members together at random it would pose a grave risk to both the inmates and the staff. [¶] So I find that it is a fundamental and essential obligation of the sheriff's department to determine whether it is dangerous to house any inmate with any other inmate or any gang member with any rival gang member." The court further found that Deputy Zaiser was not aware of any gang charges against Mota, that he used no coercive tactics, that his purpose for the interview was to ensure jail safety, and that "he had no actual subjective intent to gather incriminating information." It applied the same rationale to the booking officer's initial inquiry. Also, because Mota faced extreme danger if he were to be housed with Norteños, the court found it in Mota's best interest to be classified correctly and that "he willingly and voluntarily answered the questions for that reason." At trial, the prosecution introduced only the admissions to Deputy Zaiser.

On review, the Court of Appeal found Mota's statements to Zaiser inadmissible. Because the error was harmless, however, it affirmed the judgment.

In reviewing the trial court's ruling on a claimed *Miranda* violation, " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from [those facts] whether the challenged statement was illegally obtained.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 385, quoting *People v. Cunningham* (2001) 25 Cal.4th 926, 992.)

5

B. *Custodial Interrogation and the Booking Exception*

In *Miranda, supra*, 384 U.S. 436, the United States Supreme Court established procedural safeguards, including the familiar admonitions,[4] as a prophylactic measure to protect a suspect's right against self-incrimination. (*Id.* at p. 444.) Chief Justice Warren summarized the holding: "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Ibid.*, italics added.) For *Miranda* purposes, custodial status arises if a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." (*Ibid.*)[5]

In *Rhode Island v. Innis* (1980) 446 U.S. 291 (*Innis*), the court granted certiorari "to address for the first time the meaning of 'interrogation' under *Miranda v. Arizona*." (*Id.* at p. 297.) The court clarified that "interrogation" was not limited to express questioning. Instead, the term refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Id.* at p. 301, fn. omitted.) While the court's definition contemplated an exception to *Miranda*'s protections for words

---

**4**　As provided in *Miranda*, the person "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda*, *supra*, 384 U.S. at p. 479.)

**5**　It is undisputed that Mota was in custody when he was questioned. Our discussion of custodial interrogation addresses the situation before us, namely, a person arrested and awaiting trial. We offer no view on the proper scope of questions posed to convicted inmates.

or actions "normally attendant to arrest and custody" (*ibid*.), it had no occasion to apply that exception to the facts before it (see *id*. at pp. 302-303).

Before *Innis* was decided, we had held in *People v. Rucker* (1980) 26 Cal.3d 368 that an unadmonished suspect could be asked basic booking questions, but we created a bright-line rule that the state was precluded from "using the arrestee's responses in any manner in a subsequent criminal proceeding." (*Id*. at p. 389.) Following the passage of Proposition 8 in 1982, California courts may adopt evidentiary rules of exclusion only if they are required by the federal Constitution. (Cal. Const., art. I, § 28, subd. (f)(2); *People v. Peevy* (1998) 17 Cal.4th 1184, 1188 (*Peevy*); *People v. May* (1988) 44 Cal.3d 309, 315-317 (*May*); *In re Lance W.* (1985) 37 Cal.3d 873, 879, 887-888.) *Rucker*'s bright-line exclusionary rule for an arrestee's un-Mirandized booking statements has been superseded by subsequent United States Supreme Court case law, which we discuss below. Accordingly, we look to high court authority to resolve the booking question issue. That authority recognizes that, for a limited category of booking questions involving biographical data, no *Miranda* warnings are required and admission of the defendant's answers at trial does not violate the Fifth Amendment. For questions outside this limited category, however, answers given, without an admonition, to questions an officer should know are reasonably likely to elicit an incriminating response may not be admitted in the prosecution's case-in-chief.[6]

In *Pennsylvania v. Muniz* (1990) 496 U.S. 582 (*Muniz*), the Supreme Court considered whether an unadmonished arrestee's booking statements were

---

[6] We have no occasion here to consider under what circumstances such statements might be used to impeach a testifying defendant, and we express no view on that matter. (See *Harris v. New York* (1971) 401 U.S. 222, 224-225; *May*, *supra*, 44 Cal.3d at pp. 315-319; but see *Mincey v. Arizona* (1978) 437 U.S. 385, 397-398.)

7

admissible. Muniz had been arrested for driving under the influence. While being booked and without admonition he was asked to give his name, address, height, weight, eye color, birthdate, and age. He was also asked whether he knew the date of his sixth birthday. (*Id.* at pp. 585-586.) At trial, the prosecution introduced a videotape of the booking process, which showed that the defendant stumbled over his address and age and was unable to calculate the date when he turned six years old. (*Id.* at pp. 585-587.)

Eight justices affirmed established precedent that "the [Fifth Amendment] privilege does not protect a suspect from being compelled by the State to produce 'real or physical evidence.' [Citation]. Rather the privilege 'protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature.' [Citation.]" (*Muniz*, *supra*, 496 U.S. at p. 589.) Examples of " 'real or physical evidence' " include fingerprints, photographs, handwriting exemplars, blood samples, standing in a lineup, or speaking for voice identification. (*Id.* at pp. 591-592.)

By contrast, five justices agreed that " 'evidence of a testimonial or communicative nature' " (*Muniz*, *supra*, 496 U.S. at p. 589), focuses on the *content* of the evidence compelled (*id.* at pp. 592, 598-599).[7] The majority relied on *Doe v. United States* (1988) 487 U.S. 201: "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual

---

[7] The court has used the term "testimonial" differently depending on context. The definition given here relates to the Fifth Amendment right to avoid giving testimony against one's interest. A separate context involves the Sixth Amendment right to confront witnesses. (See *Crawford v. Washington* (2004) 541 U.S. 36, 68.) The term "testimonial" as used here and in *Muniz* relates only to the right against self-incrimination. This case in no way implicates the court's *Crawford* jurisprudence. (See *People v. Bejasa* (2012) 205 Cal.App.4th 26, 41, fn. 8.)

assertion or disclose information." (*Id.* at p. 210, quoted in *Muniz*, at p. 594.) The policy and purpose of the Fifth Amendment privilege are served when "the privilege is asserted to spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government." (*Doe*, at p. 213.) While the *Muniz* majority did not "explore the outer boundaries of what is 'testimonial,' " (*Muniz*, at p. 596), it concluded that when a person is asked to give "an express or implied assertion of fact or belief" the answer will have "a testimonial component" (*id.* at p. 597).

Turning to the questions at issue, a majority ultimately coalesced in favor of admitting the defendant's responses regarding his biographical data, and excluding his response to the sixth birthday question, but their reasons varied. A four-justice plurality written by Justice Brennan concluded that the seven questions about Muniz's name, address, etc. fell under a " 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the ' "biographical data necessary to complete booking or pretrial services." ' [Citations.]" (*Muniz*, *supra*, 496 U.S. at p. 601 (plur. opn. of Brennan, J.).) Chief Justice Rehnquist's concurring and dissenting opinion, joined by three others, presumed the validity of the booking exception but declined to rely on it, finding instead that the defendant's answers were not testimonial and thus did not warrant application of the privilege. (*Id.* at pp. 607-608 (conc. & dis. opn. of Rehnquist, C. J.).) Justice Marshall alone dissented from the holding that *Innis* created a booking exception. (*Id.* at pp. 608-609, 611 & fn. 1 (conc. & dis. opn. of Marshall, J.).)

Turning to the sixth birthday question, the Brennan plurality implicitly concluded that it did not fall under the booking exception. (See *Muniz*, *supra*, 496 U.S. at pp. 592-600 (plur. opn. of Brennan, J.).) A majority of the court found the

9

defendant's answer inadmissible because it was testimonial and carried with it an "incriminating inference of impaired mental faculties." (*Id.* at p. 599; see *id.* at p. 608 (conc. & dis. opn. of Marshall, J.).) Justice Marshall's separate opinion emphasized that the sixth birthday question constituted interrogation under the *Innis* test. (*Id.* at pp. 608, 611, fn. 1 (conc. & dis. opn. of Marshall, J.).)

Since *Muniz*, the booking exception has become firmly recognized. (*People v. Williams* (2013) 56 Cal.4th 165, 187 (*Williams*).) The question here is the extent of the exception.

C. *Questions Posed to Arrestees About Gang Affiliation*

Courts of Appeal have divided over whether the exception extends to questions about gang affiliation. *People v. Gomez* (2011) 192 Cal.App.4th 609 (*Gomez*) held that "courts should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information." (*Id.* at p. 630.) It identified several relevant factors: "the nature of the questions, such as whether they seek merely identifying data necessary for booking [citations]; the context of the interrogation, such as whether the questions were asked during a noninvestigative clerical booking process and pursuant to a standard booking form or questionnaire [citations]; the knowledge and intent of the government agent asking the questions [citations]; the relationship between the question asked and the crime the defendant was suspected of committing [citations]; the administrative need for the information sought [citations]; and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the guise or pretext of seeking routine biographical information [citations]." (*Id.* at pp. 630-631.) The *Gomez* court derived its test from qualifying language in Justice Brennan's plurality opinion in *Muniz*: " '[r]ecognizing a "booking exception" to *Miranda* does not mean, of course, that any question asked during

10

the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are *designed to elicit incriminatory admissions*.' [Citations.]" (*Muniz, supra*, 496 U.S. at p. 602, fn. 14 (plur. opn. of Brennan, J.), italics added, quoted in *Gomez*, at p. 629.)

The *Gomez* court acknowledged that questions about gang affiliation go beyond mere biographical or identifying data necessary for booking. (*Gomez, supra*, 192 Cal.App.4th at p. 633.) It concluded, however, that such questions are " 'reasonably related to the *police's administrative concerns*' " because they are relevant to classify the inmate for jail security purposes. (*Id*. at p. 634, quoting *Muniz, supra*, 496 U.S. at pp. 601-602, italics in *Gomez*.) The court found that the questions involved there were not a pretext for eliciting incriminating information. They were "asked in a legitimate booking context, by a booking officer uninvolved with the arrest or investigation of the crimes, pursuant to a standard booking form." (*Gomez*, at p. 635.) The deputy had no detailed knowledge of the crimes for which the defendant was arrested and asked the questions for jail security purposes. Accordingly, the court found the unadmonished answers admissible. (*Ibid*.)

The Court of Appeal here, by contrast, concluded that whether questions asked during booking were designed or intended to elicit incriminatory admissions was not the dispositive inquiry. Instead, the court harkened back to the *Innis* standard. "[E]ven if a question was not intended to evoke an incriminating response, if it was a question the officer should have reasonably expected to evoke such a response it would fall outside the booking exception." The court observed that questions about gang affiliation could not be characterized as " 'mere pedigree information' " like name, address, or date of birth. Rather, in California, gang membership often "carries with it penal consequences." The court's ruling was

11

tailored. It did not bar the asking of gang affiliation questions. It held only that the answers to such questions "may not be used against defendant at trial . . . in the absence of *Miranda* warnings."

The People urge us to endorse the *Gomez* view and hold that Mota's answers to gang affiliation questions come within the booking exception. They argue the questions were essential to institutional security, were asked of every prisoner at intake, were not part of a criminal investigation, and were asked under circumstances lacking the inherently coercive features of custodial interrogation. They maintain that these factors trigger the booking exception regardless of whether the questions are reasonably likely to elicit an incriminating response. According to the People, "cabin[ing] the booking exception through *Innis*'s should-have-known test . . . in effect exclud[es] responses to routine booking questions as though the booking exception did not exist."

Contrary to the People's argument, *Muniz* did not create a broad *Miranda* exception for all questions asked during booking that are reasonably related to administrative concerns. Significantly, the actual questions posed in *Muniz*, and the standard adopted by the court, were limited to basic " 'biographical data necessary to complete booking or pretrial services.' " (*Muniz, supra*, 496 U.S. at p. 601.) That circumstance both illuminates and qualifies *Innis*'s language exempting from the definition of custodial interrogation words or actions "normally attendant to arrest and custody." (*Innis, supra*, 446 U.S. at p. 301.) This narrow reading of the booking exception comports with the Supreme Court's long-standing recognition that "[d]isclosure of [one's] name and address is an essentially neutral act." (*California v. Byers* (1971) 402 U.S. 424, 432.) "Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances." (*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.* (2004) 542 U.S. 177, 191

12

(*Hiibel*).)  Thus, the *Muniz* exception originated, not simply due to administrative need, but because such questioning is generally unrelated to crime and unlikely to elicit an incriminating response.  (*U.S. v. Henley* (9th Cir. 1993) 984 F.2d 1040, 1042; *Franks v. State* (Ga. 1997) 486 S.E.2d 594, 597.)  Accordingly, law enforcement may pose these questions and the answers may be admitted without assessing their incriminatory nature on a case-by-case basis.  (*Muniz*, *supra*, 496 U.S. at p. 602; but see *id*. at p. 602, fn. 14.)

Which brings us squarely to the scope of the exception.  We need not, and do not articulate that scope in all particulars.  Here, we only determine that questions about gang affiliation exceed it.

The questions at issue here did not seek to secure the identifying biographical information necessary for booking.  While these questions have administrative relevance to housing assignments (see discussion, *post*, at p. 21), we agree with the *Gomez* court that "the state can book, arraign, and identify a suspect's relatives [for visitation purposes] without knowing the arrestee's gang affiliation."  (*Gomez*, *supra*, 192 Cal.App.4th at p. 634.)

When booking questions go beyond the basic biographical data contemplated in *Muniz*, the core concerns of *Miranda* and *Innis* are implicated.  The high court has recognized that broader questioning during the booking process may elicit incriminating responses depending on the circumstances.  The *Muniz* court held that the defendant's answer to the sixth birthday question carried with it an "incriminating inference of impaired mental faculties."  (*Muniz*, *supra*, 496 U.S. at p. 599.)  Because it was not preceded by a valid *Miranda* waiver, the response should have been suppressed.  (*Id*. at p. 600.)

It is no answer that the questions are necessary to meet police administrative concerns.  The fact remains that unadmonished custodial interrogation implicates the Fifth Amendment.  (*Miranda, supra*, 384 U.S. at pp.

13

444, 458, 461, 467; accord, *United States v. Patane* (2004) 542 U.S. 630, 639; *Dickerson v. United States* (2000) 530 U.S. 428, 435; *Oregon v. Elstad* (1985) 470 U.S. 298, 307.)  Any number of questions posed to arrestees, such as whether they are injured or under the influence of drugs or alcohol, and how they came to be so, may be both necessary and highly incriminating.  In-custody defendants generally retain their Fifth Amendment protections even if the police have good reasons for asking un-Mirandized questions.  (But see *New York v. Quarles* (1984) 467 U.S. 649, 654 (*Quarles*).)**8**

Nor is it dispositive that the officer asked the question for a non-investigatory purpose rather than as a pretext for eliciting incriminating information.  "[A]pplications of the *Miranda* rule generally do not turn upon the individual officer's subjective state of mind . . . ."  (*Peevy, supra,* 17 Cal.4th at p. 1199.)  Although the *Muniz* plurality contemplated that unwarned questions " '*designed* to elicit incriminatory admissions,' " would be excludable, that observation was made in reference to questions that would otherwise satisfy the booking exception.  (*Muniz, supra*, 496 U.S. at p. 602, fn. 14.)  As explained, these questions do not.  The *Muniz* plurality did not purport to overrule the objective standard articulated in *Innis* for custodial interrogation in general.  On the contrary, it reaffirmed *Innis*'s definition of interrogation.  (*Muniz*, at pp. 600-601.)  In *Innis*, the Court concluded that "[a] practice that the police *should know* is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation."  (*Innis*, *supra*, 446 U.S. at p. 301, italics added.)  The design or intent of the police is relevant to the extent it demonstrates what the police should have known about the nature of the questioning.  (*Id*. at pp. 301-302,

---

**8**  A further discussion of *Quarles* appears *post*, at pages 19-20.

fn. 7.)  Nevertheless, it is not a necessary showing; the test is objective, as the high court has recently observed.  (See *Michigan v. Bryant* (2011) 562 U.S. 344, __, fn. 7 [131 S.Ct. 1143, 1156-1157, fn. 7].)

The People rely on *Williams, supra*, 56 Cal.4th 165, as support for a broader booking exception for gang affiliation questions.  *Williams* is distinguishable.  While Williams was being processed into prison, he encountered another prisoner who was related to people Williams had allegedly murdered.  The relative told Williams, " 'You're a dead man[.]' " (*Id*. at p. 174.)  During his subsequent intake interview, Williams volunteered, without elaboration, that he needed protective custody.  When an officer asked him to explain, Williams said " 'they're going to stab me,' " but would not identify who " 'they' " were.  (*Ibid*.)  Asked why he was in danger, Williams responded, " '[b]ecause I killed two Hispanics.' " (*Ibid*.)

We concluded that this statement was admissible despite the absence of *Miranda* warnings.  We began with the *Innis* definition of "interrogation." (*Williams, supra,* 56 Cal.4th at pp. 186-187, quoting *Innis, supra*, 446 U.S. at pp. 301-302.)  We acknowledged *Muniz*'s booking exception and the multifactor test adopted in *Gomez*.  (*Williams*, at pp. 186-187.)  We did observe that the defendant's questioning "was part of a routine, noninvestigative prison process" in which the officer sought "only to determine the nature of the danger facing defendant, in order to minimize it." (*Id*. at p. 188.)  Ultimately, however, we returned to the *Innis* test and found it satisfied:  "The officers were appropriately responding to defendant's own security concern, *and would not reasonably have expected him to produce a confession*." (*Ibid.*, italics added.)  Thus, *Williams* did not reject, but applied, the *Innis* test for questions in the booking setting.  (Accord, *People v. Bradford* (1997) 14 Cal.4th 1005, 1034-1035.)

15

*Williams* disapproved of *People v. Morris* (1987) 192 Cal.App.3d 380 (*Morris*) "to the extent it is inconsistent with our conclusion" that "defendant's *Miranda* arguments are without merit." (*Williams, supra*, 56 Cal.4th at p. 188 & fn. 15.) In *Morris*, a booking officer asked the defendant " 'if we should anticipate any type of problem with his being there in jail' " and, " ' "Who are you accused of killing?" ' " (*Morris*, at p. 388.) In response to the second question, the defendant said " ' "I never did anything like this before—I killed my sister-in-law." ' " (*Ibid*.) In finding the answer inadmissible, the *Morris* court held that "[t]he focus of our analysis is *not* what the police may lawfully ask a criminal suspect to ensure jail security. The police may ask whatever the needs of jail security dictate. However, when the police know or should know that such an inquiry is reasonably likely to elicit an incriminating response from the suspect, the suspect's responses are not admissible against him in a subsequent criminal proceeding unless the initial inquiry has been preceded by *Miranda* admonishments." (*Id*. at pp. 389-390.)

*Williams* did not criticize *Morris*'s statement of the law, but rather its application of that standard to the facts before it. *Morris* concluded that the officer's questions went "well beyond the type of neutral questioning permissible in a booking interview." (*Morris, supra*, 192 Cal.3d at p. 389.) But the opinion predated the high court's decision in *Muniz,* and failed to "explain why, in light of the officer's testimony that the questions he asked were a normal booking procedure for those jailed on serious charges, the *Innis* exception for questioning 'normally attendant to arrest and custody' did not apply." (*Williams, supra*, 56 Cal.4th at p. 187.) The *Morris* court also failed to persuasively explain why asking the defendant what he was accused of was "reasonably likely to yield an incriminating response." (*Williams*, at p. 187.) Indeed, we reached the opposite conclusion in *Williams* respecting similar questions posed to that defendant about

16

what the defendant's crime was and why someone would want to stab him. (*Williams,* at p. 188.)  It was in these respects that we disapproved *Morris* as "inconsistent with our conclusion."  (*Williams*, at p. 188, fn. 15.)

Ⅰ*Williams* did not involve standard gang-affiliation questions.  Now that the question is squarely before us, we reject the multifactor test set out in *Gomez*, *supra*, 192 Cal.App.4th at pages 630-631.**9**  Gang affiliation questions do not conform to the narrow exception contemplated in *Innis* and *Muniz* for basic identifying biographical data necessary for booking or pretrial services.  Instead, they must be measured under the general *Innis* test, which defines as "interrogation" questions the police should know are "reasonably likely to elicit an incriminating response."  (*Innis, supra,* 446 U.S. at pp. 301-302.)

Applying that test, we conclude that the gang affiliation questions posed to Mota were reasonably likely to elicit an incriminating response.  California has enacted a comprehensive scheme of penal statutes aimed at eradicating criminal activity by street gangs.  (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1129.)  The California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.) "created a substantive offense, section 186.22(a), which punishes [as a misdemeanor or felony] '[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang . . . .' " (*Rodriguez*, at p. 1130, quoting § 186.22, subd. (a).)  Subdivision (b)(1) of that section imposes

---

**9**     We disapprove *People v. Gomez*, *supra*, 192 Cal.App.4th 609, to the extent it is inconsistent with this opinion.  Our citation to *Gomez* with approval in *Williams*, *supra*, 56 Cal.4th at pages 187-188, no longer provides persuasive authority.

17

greater punishment when a felony is committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).)  The additional punishment can be substantial.[10]

Section 12022.53 provides enhancements for *personal* use or discharge of a firearm.  (§ 12022.53, subds. (b)-(d).)  Its provisions apply to *any principal* when the offense is committed to benefit a criminal street gang.  (§ 12022.53, subd. (e)(1); *People v. Brookfield* (2009) 47 Cal.4th 583, 590.)

Finally, in 2000 the voters passed Proposition 21, which added intentional gang-related murders to the list of special circumstances authorizing penalties of death or life without the possibility of parole.  (§ 190.2, subd. (a)(22); *Lopez*, *supra*, 34 Cal.4th at p. 1009.)  It also created the crime of conspiracy to commit a felony by active street gang participants.  (§ 182.5.)

Gang membership, standing alone, is not a crime.  (*People v. Gardeley* (1996) 14 Cal.4th 605, 623-624 (*Gardeley*).)  Nonetheless, as the Supreme Court made clear in *Miranda*, "[n]o distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense.  The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish

---

[10]    Most felonies are subject to an additional prison term of two, three, or four years.  (§ 186.22, subd. (b)(1)(A).)  If the underlying crime is a serious felony, the additional term is five years.  (*Id*., subd. (b)(1)(B).)  If the underlying felony is a violent felony, the additional term is 10 years.  (*Id*., subd. (b)(1)(C).)  For a few enumerated felonies, the statute imposes an indeterminate term of life in prison.  (*Id*., subd. (b)(4); see also *People v. Jones* (2009) 47 Cal.4th 566, 571.)  For felonies "punishable by imprisonment in the state prison for life," the statute imposes a 15-year minimum parole eligibility term.  (§ 186.22, subd. (b)(5); *People v. Lopez* (2005) 34 Cal.4th 1002, 1006-1007, 1010-1011 (*Lopez*).)

18

degrees of incrimination." (*Miranda, supra,* 384 U.S. at p. 476.)  Indeed, the high court has recognized that "the Fifth Amendment privilege against compulsory self-incrimination 'protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.' " (*Hiibel, supra,* 542 U.S. at p. 190, quoting *Kastigar v. United States* (1972) 406 U.S. 441, 445.)

Mota was asked to disclose whether he was a member or associate of an established criminal street gang whose members have a history of committing violence against rival gangs.  He was charged with murder, a crime frequently committed for the benefit of criminal street gangs, and a qualifying offense establishing a " 'pattern of criminal gang activity.' " (§ 186.22, subd. (e)(3); see *Gardeley*, *supra*, 14 Cal.4th at pp. 624-625.)  Under these circumstances, questions about Mota's gang affiliation were reasonably likely to elicit an incriminating response potentially exposing Mota to prosecution for the crime of gang participation (§ 186.22, subd. (a); *People v. Rodriguez, supra*, 55 Cal.4th at p. 1130) and to enhanced punishment (§§ 186.22, subd. (b); 12022.53, subd. (e)(1)).  This likelihood was apparent even if the deputies' subjective intention was benign.  Accordingly, Mota's unadmonished answers to these questions were inadmissible at trial.

D.  Quarles' *Public Safety Exception*

To support their broad interpretation of the booking exception, the People rely by analogy on another *Miranda* exception:  questions that address an imminent threat to public safety. (See *Quarles, supra,* 467 U.S. 649.)  They argue that "[j]ust as 'the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination,' [*Quarles*,] at p. 657, so too does the need for police to run a jail or a prison."  The analogy fails.

In *Quarles*, the victim approached patrol officers and told them she had just been raped. She described her assailant and said he was in a nearby convenience store armed with a gun. Quarles was arrested in the store wearing an empty shoulder holster. Without providing *Miranda* advisements, the officer asked where the gun was. Quarles admitted he had hidden it in a nearby carton. (*Quarles*, *supra*, 467 U.S. at pp. 651-652.) The trial court found a *Miranda* violation and excluded the defendant's statement, the gun itself, and the defendant's post-*Miranda* admission of ownership. (*Id*. at pp. 652-653.)

Notwithstanding the incriminating nature of the question posed to the defendant (see *Quarles*, *supra*, 467 U.S. at p. 667 (conc. & dis. opn. of O'Connor, J.); *id*. at p. 677 (dis. opn. of Marshall, J.)), the Supreme Court established a narrow exception to the *Miranda* rule in situations involving an imminent threat to public safety. (*Quarles*, at p. 658.) It reasoned that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." (*Id*. at 657.) Noting the "kaleidoscopic situation" confronting the officers (*id*. at p. 656), the court declined to place them "in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them" (*id*. at pp. 657-658).

Critical to the court's holding was the "objectively reasonable need to protect the police or the public from any *immediate danger* associated with the weapon." (*Quarles, supra,* 467 U.S. at p. 659, fn. 8, italics added; see also *id*. at p. 657.) Cases applying the public safety exception have emphasized these factors.

20

(See, e.g., *People v. Cressy* (1996) 47 Cal.App.4th 981, 986-989 [officer properly searching an arrestee may ask about the presence of needles or other potentially contaminated sharp objects]; *U.S. v. Carrillo* (9th Cir. 1994) 16 F.3d 1046, 1049-1050 [before search at a detention center officer may ask if arrestee has any drugs or needles on his person]; *U.S. ex rel. Williams v. McAdory* (N.D.Ill. 2004) 342 F.Supp.2d 765, 769 [arresting officer could ask if arrestee had "any weapons, knives, or needles on him"].)  No such imminent danger was present here. Without minimizing the serious safety concerns confronted in jails and prisons, we conclude that the legitimate need to ascertain gang affiliation is not akin to the imminent danger posed by an unsecured weapon that prompted the *Quarles* court to adopt a public safety exception to the requirement of *Miranda* admonitions.

To be clear, it is permissible to *ask* arrestees questions about gang affiliation during the booking process.  Jail officials have an important institutional interest in minimizing the potential for violence within the jail population and particularly among rival gangs, which " 'spawn a climate of tension, violence and coercion.' [Citation.]" (*Florence v. Board of Chosen Freeholders of County of Burlington* (2012) __ U.S. __, __ [132 S.Ct. 1510, 1518].)  To that end, they retain substantial discretion to devise reasonable solutions to the security problems they face.  (See *id*. at p. __ [132 S.Ct. at pp. 1515, 1517].)  We simply hold that defendant's answers to the unadmonished gang questions posed here were inadmissible in the prosecution's case-in-chief.  (*Miranda, supra,* 384 U.S. at p. 479.)[11]

---

[11]  Mota also argues that his admission of gang membership was inadmissible under *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 because he invoked his right to counsel.  Having concluded that his answers were inadmissible under *Miranda*, we need not address this claim, which falls outside the issues specified in our grant of review.

E. *Prejudice*

The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309-312; *People v. Cahill* (1993) 5 Cal.4th 478, 510; *People v. Sims* (1993) 5 Cal.4th 405, 447.) That test requires the People here "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, at p. 24.)

That burden is satisfied. Mota's gang membership was convincingly established by three witnesses who testified that they knew him to be a member of VFL. Their testimony was both definitive and uncontroverted. Mota nonetheless argues that this evidence was insufficient to render his admissions harmless because all three witnesses were accomplices and their testimony was not adequately corroborated. Not so. The jurors were instructed that Sanchez was an accomplice as a matter of law and that they must determine whether Menendez and Luis Ruelas qualified as accomplices in light of the facts. They were instructed how to make that determination and how to evaluate the evidence accordingly.[12] Even assuming the jurors found all three witnesses to be accomplices, the corroboration required for an accomplice may be slight and entirely circumstantial; it need not establish every element of the charged offense. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271.) Here, San Pablo Police Officer Robert Brady, an expert on Norteño and Sureño criminal street gangs, opined that Mota was a gang member. Mota had committed a robbery in 2005 during which he wore a blue bandana, the Sureño color. After his arrest for that robbery, Mota was seen making a hand sign

---

[12] The instructions given were CALJIC Nos. 3.13, 3.14, 3.16, 3.18, and 3.19. (See also CALCRIM Nos. 334, 335.)

22

that signified his Sureño status.  Additionally, photographs taken of Mota at the funeral of a VFL gang member depicted Mota making similar gang signs.  This testimony adequately corroborated the accomplice's statements that Mota was a VFL gang member.

Because Mota's gang affiliation was amply established by independent and uncontradicted evidence, the erroneous admission of his challenged statements was harmless beyond a reasonable doubt.

### III.  DISPOSITION

The judgment of the Court of Appeal is affirmed.


                                                        **CORRIGAN, J.**

**WE CONCUR**:

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

23

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Elizalde
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 222 Cal.App.4th 351
**Rehearing Granted**


_____

**Opinion No.** S215260
**Date Filed:** June 25, 2015
_____

**Court:** Superior
**County:** Contra Costa
**Judge:** John W. Kennedy


_____

**Counsel:**

Solomon Wollack, under appointment by the Supreme Court, for Defendant and Appellant Gamaliel Elizalde.

Stephen B. Bedrick, under appointment by the Supreme Court, for Defendant and Appellant Jose Mota-Avendano.

John Ward, under appointment by the Supreme Court, for Defendant and Appellant Javier Gomez.

Kamal D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan, Rene A. Chacon, David M. Baskind and Juliet B. Haley, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephen B. Bedrick
1970 Broadway, Suite 1200
Oakland, CA 94612
(510) 452-1900

Juliet B. Haley
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 703-5960