Filed 11/29/22 P. v. Aguilera CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JESUS AGUILERA, Defendant and Appellant. | F079327 (Tulare Super. Ct. No. VCF322085B) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County. Kathryn T. Montejano, Judge.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Ivan P. Marrs, Julie A. Hokans, and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant was convicted of murder and three counts of attempted murder in connection with a gang-related shooting. The prosecution's theory was that three Sureños, including defendant, were driving around looking for Norteños to attack. They located a group of Norteños walking down the street, turned off their headlights, and parked down the street. Two of the Sureños, including defendant, exited the vehicle and fired at least 10 shots at a group of Norteños, killing one of them.

Defendant's trial was bifurcated from that of his two codefendants, because they had made incriminating postarrest statements. Despite efforts to redact direct references to defendant, their statements clearly implicated defendant as one of the two shooters. The Attorney General concedes the admission of these statements was error under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) but asserts their admission was harmless beyond a reasonable doubt. We conclude the People have failed to carry their burden of demonstrating harmlessness and reverse. The matter may be retried.

## BACKGROUND

In an information filed October 27, 2016, the Tulare County District Attorney charged defendant with the murder of L.A. (count 1; Pen. Code, § 187, subd. (a)),[1] the attempted murders of A.N., N.L., and M.O. (counts 2, 3, 4, respectively; §§ 664, 187, subd. (a).)

The information further alleged the gang-murder special circumstance (§ 190.2, subd. (a)(22) applied to count 1. Additionally, the information alleged, as enhancements to count 1, that a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)) causing great bodily injury and death (§ 12022.53, subds. (d) & (e)(1).)

As to counts 2 through 4, the information alleged a principal personally and intentionally used (§ 12022.53, subds. (c) & (e)(1)) and discharged a handgun (*ibid.*).

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2.

The information alleged that each count was punishable "in the state prison for life" pursuant to section 186.22, subdivision (b)(5).

A transfer hearing was held pursuant to Proposition 57 since defendant was 17 years old when the alleged offenses were committed. The court found that defendant was not suitable for juvenile services and the matter was transferred "to proceed on adult filing."

Defendant's trial was severed from that of his two codefendants, Jesus Mojica Navarro and Gilberto Velasquez, because they both made postarrest statements. At a pretrial hearing, defendant's counsel objected to the prosecutor bringing in Navarro's and Velasquez's postarrest statements at defendant's trial. Defendant's counsel argued (1) he had received insufficient discovery from the prosecution concerning the statements; (2) the statements were case-specific hearsay and (3) admission of the statements would violate defendant's right to confront witnesses. As described below, portions of the codefendants' statements were admitted at defendant's trial.

On January 14, 2019, a jury convicted defendant on all counts and found true the special circumstance and all enhancements.

The court sentenced defendant to 25 years to life on count 1, plus 25 years to life pursuant to section 12022.53, subdivision (d); plus three consecutive terms of 7 years to life on counts 2 through 4, plus three 20-year terms pursuant to section 12022.53, subdivision (c). The court imposed a $10,000 restitution fine under section 1202.4, and a suspended parole revocation restitution fine of $10,000 under section 1202.45. The court ordered restitution for victim L.A. in the amount of $7,017.45 under section 1202.4, subdivision (f),[2] and restitution to the California Victims Compensation Government Claims Board in the amount of $4,685.95.

---

[2] The court left restitution as to victims A.N. and M.O. "open."

3.

## FACTS

The two "major" gangs in Tulare County are the Sureños and Norteños. The Sureños and Norteños are rivals engaged in an active, violent conflict nearly every day.[3] Violence between rival gangs, including the use of weapons, is prevalent in Tulare County. The primary activities of the Sureños gang include shootings, homicides, and shooting at inhabited dwellings.

On August 7, 2015, M.O., N.L., A.N., and L.A. were walking down Pleasant Street near the Tulare Turning Point Center. N.L. "affiliated" with the "northern criminal street gang" – i.e., the Norteños. M.O. was "involved" with the Norteño gang, but claimed he was not a member. M.O. was wearing red shorts at the time.

A car drove by "real slow" with its lights off, causing M.O. to become suspicious. The group decided to "head back." The group went through an alley and the backyard of a residence. They stayed in the backyard for a few minutes, hoping they would not be found by the vehicle. After a few minutes, the group began walking on Pleasant Street again.

L.A. said, " 'There's two people behind us.' " M.O. caught a glimpse of the pursuers when they were about 33 feet away. M.O. then heard more than 10 gunshots. His group ran through the alley. L.A. said he had been "hit." L.A. was throwing up blood and fainted. M.O. held L.A. so he would not choke on his blood. L.A. bled to death from a single gunshot wound to the back.

M.O. told responding officers that the two men who had pursued them on foot had been in the slow-driving car beforehand.

Officer Muller was on duty that night when he received a broadcasted description of a green Acura involved in a shooting. He located the vehicle and pulled it over. The

---

[3] We do not delve deeply into the gang evidence as it does not prove material to our disposition set forth below. We do grant defendant's unopposed request for judicial notice as to the abstracts of judgment pertaining to two predicate offenses offered at trial. However, they are not material in light of our reversal of the judgment.

front passenger exited the vehicle and fled. Though Officer Muller did not pursue the fleeing subject, he observed him holding his waistband and tugging toward the center of his body.

An individual matching the description of the person Officer Muller observed flee from the vehicle was found hiding behind a vehicle. The individual was defendant. He had gunshot residue on his right hand.[4] He was wearing blue shorts.

A revolver was found in the driveway of a residence near where defendant was found. There were five spent casings in the revolver. A swab of the revolver contained a DNA sample with four contributors. The DNA results were uninterpretable, meaning the four contributors to the DNA sample could not be identified.

The driver of the Acura, Jesus Navarro, was also arrested. A third occupant had also been in the vehicle, Gilberto Velasquez.

A cell phone in defendant's possession had previously sent a text message indicating the sender was "mobbing" around Tulare "Buster hunting."[5] "Buster" is a derogatory term used to refer to Norteños. "Buster hunting" means searching for Norteños to commit acts of violence against them.

The next day, officers were searching for Velasquez. Officers executed a search warrant on Velasquez's home. They found a revolver under a dresser, with a blue bandana wrapped around the handle. The revolver had six live rounds inside.

Sergeant Tony Espinosa showed one of the three surviving victims a photographic lineup that included defendant. The victim did not identify defendant as having been involved in the shooting. In another photographic lineup, the victim identified Navarro.

One of the other surviving victims identified Velasquez in a photographic lineup as someone "he had contact with prior to the shooting, approximately 45 minutes prior on

---

[4] The criminalist could only opine that gunshot residue was on defendant's hand. She could not say how the gunshot residue came to be on defendant's hand.

[5] While the phone was found on defendant's person, law enforcement was unable to determine who actually owned the phone.

a different incident." He said that he and the other victims were at his residence when a brown pickup truck drove by. Velasquez stuck his head out of the rear driver-side window and looked in the victim's direction.

### *Navarro's Interrogation*

A few hours after the shooting, Espinosa interrogated Navarro in the Tulare Police Department booking room. After giving Navarro his *Miranda*[6] rights, Espinosa asked him several questions. Espinosa testified as to the following aspects of Navarro's interrogation before the jury.

Navarro said he was an associate of the southern street gang and "mostly hung out" with the Loco Park and South Side Kings cliques. Navarro said he had been an associate of the southern street gang for approximately two to three years. Navarro initially said his moniker was "Chuy" but later said it was "Sleepy."

Navarro said he had been "mobbing around" with two other people in the "area of Prosperity and H near the railroad tracks." Navarro said he drove the vehicle the entire night. Navarro and his passengers observed a group of individuals who "were walking like gangsters" and "had a gangster look to them." Navarro believed they were northerners because some of them were wearing red clothing.

Someone told Navarro to turn off his lights and park down the street and he complied. The two other occupants of the vehicle exited, after which Navarro heard several gunshots. The two people returned to the vehicle and Navarro observed two handguns in the vehicle.

Navarro spoke about later being pursued by police in his vehicle. Navarro admitted he did not stop right away. When he did ultimately stop, one of the occupants exited the vehicle.

Espinosa's recounting of Navarro's custodial statements did not include defendant's name.

---

[6] *Miranda v. Arizona* (1966) 384 U.S. 436.

6.

*Velasquez's Interrogation*

At about 6:00 a.m. the morning after the shooting, Espinosa interrogated Velasquez. After reading Velasquez his *Miranda* rights, Espinosa asked him several questions. Espinosa testified as to the following aspects of Velasquez's interrogation before the jury.

Velasquez said he was "a normal southerner; that he kicked it with Southerners, which means he only hangs out with Southerners, and he was a Southern associate for approximately five years." Velasquez also said he was "with" the South Side Kings clique.

Velasquez said that some four weeks prior to the shooting, he had been in front of his residence with his little sister when a northern gang member drove by and pointed a gun at him and his sister. Velasquez also said he had been shot at several times by northern gang members.

Velasquez said that two days prior to the shooting, he had been in a physical altercation with a northern gang member from the West Side Locos. When Velasquez saw the group of future victims on the night of the shooting, he recognized that the person he had been in a physical altercation with was among them wearing a red shirt. Velasquez intended to "f[**]k him up." He told the driver to pull over and turn off his lights. Velasquez and another occupant then exited the vehicle. Velasquez ran to the area of "H just north of Pleasant Street." He saw that the other group was at the corner of H and Pleasant walking eastbound. One person in the other group yelled out, "Scrap," to him.[7] Being called a scrap made Velasquez angry so he charged the group. One of them threw a stick at Velasquez. The victims ran away, at which time Velasquez fired three shots at them. He had initially planned to use his "fist," but the person ran away, and Velasquez fired a gun. Velasquez told Espinosa, " 'I lit that fool up.' " Velasquez then

---

[7] "Scrap" is a derogatory term used by northerners to refer to southerners.

7.

ran back to the vehicle. Velasquez took a shower and then put back on the same clothes he had been wearing.

Espinosa's recounting of Velasquez's custodial statements did not include defendant's name.

### Jury Instructions, Closing Arguments, and Deliberations

The court gave a "kill zone" instruction, though the prosecutor did not argue a kill zone theory of attempted murder liability in closing argument.

Defense counsel argued defendant was not one of the shooters, saying during closing argument:

> "[The prosecutor] argued to all of you my client was the shooter. The evidence says otherwise.

> "You heard a summary of an interview conducted with Velasquez and Navarro. Just like I argued to all of you before regarding these statements through Sergeant Espinosa and those text message threads, I wish I had an opportunity to cross[-examine]."

Shortly thereafter, defense counsel argued that "of course" Navarro would claim to be the driver and that he never got out of the vehicle. Counsel repeated his "wish" that he had an opportunity to cross-examine Navarro. Counsel argued his first question to Navarro would have been: "Then why would your fingerprint be on the gun if all you did was drive?"

In rebuttal, the prosecutor argued: "If you conclude that more gunshots were fired … than Gilberto[ Velasquez's] gun can fire, and you conclude that the person who was arrested in the driver's seat was the driver, he's guilty. He's one of the shooters."

During deliberations, the jury asked for various readbacks. The jury also asked questions, such as: how many individuals were in the car, and whether Espinoza had testified that defendant was driving the car. The jury also asked, "If we determine the victim's death was first degree murder, and that defendant aided & abetted, is that guilty of first degree murder, or can it be second degree murder?"

8.

## DISCUSSION

**I.    The Judgment Must be Reversed Due to Crawford Error**

*Law*

The Attorney General concedes that the admission of Velasquez's and Navarro's custodial statements was *Crawford* error, but contends the error was harmless beyond a reasonable doubt.

### How the Confrontation Clause Applies to Statements Made During Police Interrogations

The confrontation clause "is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." (*Crawford*, *supra*, 541 U.S. at p. 61.)

"[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." (*Crawford*, *supra*, 541 U.S. 36, at p. 50.) "The text of the Confrontation Clause reflects this focus. It applies to 'witnesses' against the accused – in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " (*Id.* at p. 51.)

"An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement. [¶] Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent – that is, material such as

9.

affidavits, *custodial examinations*, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.' " (*Crawford*, *supra*, 541 U.S. at p. 51, final italics added.) Thus, "[s]tatements taken by police officers in the course of interrogations are … testimonial under even a narrow standard. Police interrogations bear a striking resemblance to examinations by justices of the peace in England." (*Id.* at p. 52.)

The framers' intent was that such testimonial statements of witnesses absent from trial would be admitted "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. omitted.)

Here, defendant is unable to cross-examine Navarro and Velasquez because they have a Fifth Amendment right to avoid cross-examination. Therefore, we accept the Attorney General's concession that their custodial statements were improperly admitted and turn to the issue of prejudice.

### *Prejudice*

*Crawford* error requires reversal unless it is found beyond a reasonable doubt that "the jury verdict would have been the same absent any error." (*People v. Harrison* (2005) 35 Cal.4th 208, 239.) If there is even a reasonable possibility the erroneously admitted evidence contributed to the verdict, we must reverse the judgment. (See *Chapman v. California* (1967) 386 U.S. 18, 23.)

The People bear the burden of establishing harmlessness under this standard. (See *People v. Elizalde* (2015) 61 Cal.4th 523, 542.) We conclude the People failed to carry their burden here.[8]

The Attorney General argues the People did not rely on the statements of Navarro and Velasquez to prove their case. Specifically, that the prosecutor argued the jury could

---

[8] Because defendant must be retried and resentenced, we do not address the remainder of defendant's contentions concerning his trial and sentence.

10.

conclude Navarro was the driver because he was driving when pulled over, not because he admitted to the police that he was driving. This is incorrect, because the prosecutor argued *both* reasons for concluding Navarro was the driver, saying: "Our driver is Jesus Navarro 'cause he is located in the car. He's the driver, and *he tells [Sergeant] Espinosa I was driving; …*"

In any event, the fact that Navarro was the driver when the car was pulled over suggests only weakly, if at all, that he could not have been one of the shooters. One necessary premise in that chain of inferences would be that the shooter could not have gotten into the driver's seat after the shooting. This premise is not particularly compelling.

In contrast, Navarro's inadmissible statement directly implicates defendant as a shooter. Navarro said that two occupants in the vehicle exited, several gunshots were heard, and the two occupants returned to the vehicle. It is clear the jury would have understood Navarro to be referring to defendant and Velasquez, as they were the only other occupants of the vehicle when it was pulled over. In other words, Navarro's statement was functionally equivalent to a direct identification of defendant as a shooter. Indeed, it was the only eyewitness testimony directly implicating defendant as a shooter. And it was certainly the most compelling piece of evidence on this pivotal issue.

We cannot say the erroneous admission of such powerfully inculpatory evidence is merely cumulative to other, far weaker evidence of such a crucial fact.

### Gunshot Residue

The People also point to the gunshot residue on defendant's hand. There can be no reasonable dispute that this evidence is consistent with defendant being one of the shooters. But it is also consistent with other conclusions the jury could have reached. It is important to recall that we are not asking whether the judgment was supported by substantial evidence, but rather whether there is any reasonable doubt as to whether the inadmissible evidence affected the verdict. We are not considering whether the gunshot

11.

residue evidence supports an inference that defendant was a shooter, but rather whether the gunshot residue evidence is so overwhelmingly persuasive that the admission of other, erroneous evidence is harmless beyond a reasonable doubt. Given the expert testimony on the subject described below, we must answer that question in the negative.

The criminalist testified that gunshot residue was found on defendant's right hand, but not his left. The criminalist testified, "… I can't tell you how those particles got there. It could be that this person may have discharged a firearm, or they were just nearby when a firearm went off, or they touched some surface that had gunshot residue on it. [¶] I can't tell you how those particles got there."

The criminalist was asked the following hypothetical: "If a gun is recently fired by person A and person A hands the gun to person B and person B takes possession of it, could person B be contaminated, if you will, with any gunshot residue by taking the gun?" The criminalist responded, "So if the firearm has gunshot residue on it, and it may if it's been fired recently, then certainly, a person touching … that gun could receive particles that way."

In sum, the gunshot residue evidence is consistent with at least two theories: (1) that defendant was one of the shooters or (2) defendant was not one of the shooters but subsequently handled the gun of one of the shooters.

Similarly, the inference that defendant may have been fidgeting with a gun at his waistband while fleeing, and the inference raised by the gun found in a driveway nearby with five spent casings, both support a conclusion that defendant was *handling* the gun *after* the shooting. But neither overwhelmingly establish that he was *firing* the gun *during* the shooting. This evidence is also consistent with Navarro and Velasquez acting as shooters and giving one of the guns to defendant to dispose.

The remaining evidence cited by the Attorney General, while inculpating defendant generally as a participant in the night's events, does not foreclose a scenario wherein Navarro and Velasquez were the shooters, Navarro got into the driver's seat after

12.

the shooting, and defendant was given or picked up one of the guns – perhaps for the purpose of disposing of it. For example, the evidence that defendant is a member of the Sureños – a gang with a violent rivalry with the Norteños – is certainly relevant. But it does not differentiate defendant from the two other possible shooters – Navarro and Velasquez – because they were also Sureños.

We close by again emphasizing the nature of the question before us. On substantial evidence review it would have been immaterial that the evidence could be reconciled to a finding contrary to the one made by the jury. But on review for harmlessness under *Chapman*, we are bound to ask a different question: whether the evidence in favor of the judgment was so overwhelming that we are convinced beyond a reasonable doubt the jury would not have acquitted or hung without the inadmissible evidence. Because the admissible evidence permits of a plausible scenario wherein defendant was not a shooter, we cannot say it was harmless beyond a reasonable doubt for the jury to hear inadmissible testimonial hearsay indicating defendant *was indeed* one of the two shooters. We therefore will reverse the judgment. Defendant may be retried.

## DISPOSITION

The judgment is reversed. The matter is remanded for possible retrial.

POOCHIGIAN, ACTING P. J.

WE CONCUR:

FRANSON, J.

SMITH, J.

13.