Filed 11/17/23  P. v. Haynes CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>DAMONE HAYNES,<br><br>          Defendant and Appellant. | A163965<br><br><br>(Alameda County<br>Super. Ct. No. 20CR002198) |

Defendant appeals from a judgment following his conviction by a jury for murder (Pen. Code, § 187, subd. (a); first count),[1] carjacking (§ 215, subd. (a); third count), possession of a firearm by a felon (§ 29800, subd. (a)(1); fourth–fifth counts), and enhancements for personally and intentionally discharging a firearm causing death (§ 12022.53, subds. (c), (d)), personally using a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)), and personally inflicting great bodily injury (§ 12022.7, subd. (a)).  Defendant seeks reversal on the grounds that there is insufficient evidence to support his conviction for carjacking and felony murder; there was instructional error allowing for the possibility that some jurors based their verdict on the felony-murder theory for which there was insufficient evidence; and his codefendant's counsel acted

_____

[1] All statutory references are to the Penal Code unless stated otherwise.

as a "second prosecutor," which made defendant's trial grossly unfair and denied him due process of law. We affirm.[2]

## BACKGROUND

### I. *Shooting and Initial Investigation*

Defendant and his codefendant Anthony Rhodes (Rhodes) were tried together for the murder and carjacking of Charles Billings. Terrell Martinez (Martinez) was also charged with carjacking and being an accessory to the murder. Martinez's case was severed for trial.

At 3:00 a.m. on July 26, 2019, Oakland police were dispatched to Bancroft Avenue in Oakland after 911 calls reported a man lying in the roadway. The police found Charles Billings lying face down in the bike lane with multiple gunshot wounds. He had been shot in his temple, chest, hand, hip, and thigh. He had $500 in his pocket and a black mark on his shirt suggesting he was shot at close range. Billings was pronounced dead at the scene.

A witness at the scene provided police with the license plate number of Billings's van. The van was not present at the scene when police arrived. The police also obtained surveillance video from several homes in the area.[3] The video shows a black sedan pull behind Billings's van at approximately 2:48 a.m. The passenger in the front seat exits the sedan and approaches the van. About 45 seconds later, a second man exits the rear of the sedan and walks to the van. Two or three flashes illuminate the inside of the van, and

---

[2] By separate order filed this date, we deny Haynes's petition for writ of habeas corpus (case No. A166983) raising claims of ineffective assistance of counsel.

[3] The surveillance video of the incident was described by the prosecutor as "very grainy and very far away," such that the specific individuals could not be identified.

Billings falls out of the van onto the road. The driver of the sedan exits the vehicle. The gunman walks around to the back of the van and fires another round in Billings's direction. The gunman walks toward Billings and fires three more rounds at him. As the gunman then walks toward the back of the van, the van drives away. The gunman then walks up to Billings and fires another round at very close range. At 2:51 a.m., the sedan pulls forward, the gunman enters the sedan, and the sedan follows the van.

Surveillance footage from a gas station showed the sedan traveling on 98th Avenue with Billings's van close behind, at 2:54 a.m. Surveillance footage from cameras in San Leandro show a black Impala sedan and Billings's van traveling close together shortly after 6:00 a.m.

On July 31, 2019, the police located Billings's van in San Leandro. Two shell casings were recovered on the front passenger seat. There were two strike marks on the driver's side armrest and bullet holes in the interior of the driver's door. The police also recovered suspected heroin and cocaine.

On August 4, 2019, the police located and towed the Impala sedan seen in the surveillance video. Terrell Martinez's DNA was found on the steering wheel.

## II.   *Martinez's Testimony*

Martinez testified that he met defendant when the two were in prison in 1999. In 2019, Martinez met Rhodes through defendant. On the night of July 25, 2019, Martinez was at home, where he lived with his girlfriend, Ericka J., when defendant called him, looking for heroin. At 2:00 a.m. on July 26, defendant and Rhodes went to Martinez's home, asking for heroin. Martinez said he did not have any, and Rhodes and defendant said they knew someone who had some. Rhodes called Devon B., but Devon B. said he was out of town. Then Rhodes suggested they go meet Billings, and he asked

3

Martinez for a ride. They agreed that defendant and Rhodes would buy heroin from Billings and give some to Martinez in exchange for giving them a ride. Martinez drove Ericka's black Passat.[4] Rhodes was in the front passenger seat, and defendant was in the back seat behind Rhodes. Defendant directed Martinez to Billings's location, and he parked behind the van.

Rhodes got out of the car and walked up to the van's passenger side. Rhodes opened the rear passenger side door and leaned into the van. About a minute later, Rhodes waived defendant over. Defendant walked up to the van and opened the front passenger door. Martinez heard two pops and looked up. He saw Billings get out of the van on the driver's side, screaming, and walk toward the back of the van. Billings fell onto the street near the back bumper of the van. Martinez froze in disbelief. Martinez jumped out of the car and asked defendant what he was doing. Defendant walked to the back of the van and shot Billings a couple of times while Billings was on the ground. Rhodes drove away in the van. Defendant told Martinez to get back in the car, and he complied. Defendant got in the front passenger seat of the car, held the gun in his lap, and told Martinez to follow the van.

Martinez pulled alongside the van at a stoplight, and defendant told Rhodes to follow them. Defendant directed Martinez to drive to San Leandro, and Rhodes followed in the van. Defendant made a phone call during the drive. Martinez drove, at defendant's direction, to a parking lot behind Marcello M.'s apartment complex. At the time, Martinez did not know Marcello M. The gate to the parking lot was open when he arrived. Rhodes parked the van on the street outside the complex. Defendant and Rhodes

---

[4] Martinez had access to Ericka J.'s black Volkswagen Passat and a black Chevrolet Impala owned by Ericka J.'s mother, Verva J.

4

searched the van for about 10 to 15 minutes while it was parked on the street.  Then they told Martinez to search the van, and he did so for about 5 to 10 minutes, but he did not find anything.  Defendant and Rhodes gave Martinez some "IDs and paperwork" and told him to throw it away.  When Martinez went to throw away the papers, it looked as though defendant and Rhodes were showing each other something, but Martinez could not tell what it was.

The three of them got back into the Passat.  Defendant and Rhodes told Martinez to drive them to 98th Avenue in Oakland.  Martinez dropped them off there, and then he went back home.

Rhodes arrived at Martinez's home at 6:30 a.m. and told Martinez that defendant wanted Rhodes and Martinez to move the van.  Martinez drove Rhodes back to San Leandro in Verva J.'s Chevrolet Impala.  Rhodes moved the van about two blocks away.  Martinez then drove to a convenience store and a methadone clinic before dropping Rhodes off at a BART station.

Martinez was interviewed during the police investigation.  The police did not show Martinez the surveillance video before they spoke with him.  Martinez initially said he knew nothing about the incident.  He then told the police that he went to Billings's van to buy heroin but did not know what was going to happen and as soon as the shooting started he drove off alone and went straight home.  Eventually, Martinez told the police the more detailed version of what happened.  Martinez testified at trial without any agreements from the district attorney's office.

### III.  *Telephone Records*

The police reviewed Billings's cell phone records and found that three hours before the shooting, Billings received a call from a number ending in 6544.  The 6544 number was registered to Gloria P.  Thirteen minutes before

5

the shooting, the 6544 number received a call from a number ending in 6322. Martinez testified that in July 2019, Rhodes loaned him a phone with the 6322 number and he used it for about a month and a half. However, Martinez said that on the night of the incident, Rhodes used the phone with the 6322 number to contact Devon B. Based on cell tower records, both phones were in East Oakland 13 minutes before the shooting. An inspector from the Office of the Alameda County District Attorney was qualified as an expert in cell phone detail interpretation and cell phone plotting. He reviewed phone records provided to him, including records for the 6544 number and the 6322 number. He testified that between 2:37 a.m. and 3 a.m. on July 26, 2019, there was no contact between these two phones, which suggested to him that the people using the phones were together. Both phones continued to communicate with each other after the murder and appeared to travel to San Leandro. Immediately after the shooting, the 6544 number also made repeated attempts to contact Marcello M.'s phone number. Ten minutes after the shooting, the 6322 number used a cell tower less than a mile from where Billings's van was found.

When defendant was arrested at a home in Hayward, the police searched the residence and found four phones, including the 6544 number. A woman named Sandra P. (with the same last name as Gloria P.) was present in the home at the time of defendant's arrest.

## DISCUSSION

I. *Sufficient Evidence Supports Carjacking and Felony-murder Theory*

Defendant was charged with murder under two theories: premeditation and deliberation (§ 187, subd. (a)), and felony murder based on a carjacking (§§ 189, subd. (e)(1), 215, subd. (a)). He was also charged separately with carjacking. The jury was instructed on first degree murder

6

based on premeditation and deliberation, and on felony murder premised on an unlawful killing during the commission or attempted commission of carjacking and as a coparticipant in the carjacking. (CALCRIM Nos. 521, 540A, 540B.) The jury was also instructed with CALCRIM No. 548 as follows: "The defendant has been prosecuted for murder under two theories: (1) malice aforethought, and (2) felony murder. Each theory of murder has different requirements, and I will instruct you on each. You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories. You do not all need to agree on the same theory, but you must unanimously agree whether the murder is in the first or second degree."

Defendant argues there is insufficient evidence to support his convictions for carjacking and felony murder based on carjacking. Specifically, he claims there is no substantial evidence that he intended to steal Billings's van when he used force against him. We disagree.

Carjacking "is the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, . . . against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." (§ 215, subd. (a).) "The requisite intent—to deprive the possessor of possession—must exist before or during the use of force." (*People v. Gomez* (2011) 192 Cal.App.4th 609, 618, disapproved on other grounds in *People v. Elizalde* (2015) 61 Cal.4th 523; § 20.)

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal,

7

we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Defendant argues there was no evidence that he and his coperpetrators intended to steal Billings's van or that they killed him in order to take his van. Instead, defendant asserts that the evidence shows they drove to Billings's location in their own vehicle and, thus, did not need Billings's van to escape. Nor was there any evidence that this was a " 'thrill seeking theft' " or that any words were spoken or threats made to Billings demanding that he relinquish the van. Defendant further argues there was no evidence that he and his coperpetrators wanted to steal drugs or money from the van or from the victim, given that the police recovered drugs from the van and the scene of the shooting and found $500 in Billings's pocket. Finally, defendant claims there was no evidence of any preconceived plan to search the van or that anything was taken from the van. However, he acknowledges Martinez's testimony that after the van was searched, defendant directed Martinez to throw away some "IDs and paperwork." According to defendant, the evidence suggests Billings was shot for reasons other than the taking of his van.

While defendant posits alternative inferences that may be drawn from the evidence, this is not enough to warrant reversal. (*People v. Ochoa, supra,*

8

6 Cal.4th at p. 1206; *People v. Houston* (2012) 54 Cal.4th 1186, 1215 [where the circumstances reasonably justify jury's findings, a judgment may not be reversed simply because circumstances might also reasonably be reconciled with a contrary finding].)

While there is no direct evidence of defendant's stating an intention to steal Billings's van, the circumstances support the jury's finding. (See *People v. Thomas* (2011) 52 Cal.4th 336, 355 ["Mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially"].) Defendant arrived at the scene with his coperpetrator and then shot Billings, who fell out of his van. As soon as Billings was out of the van, defendant's coperpetrator immediately drove the van away. Defendant followed close behind the van and then directed Martinez to move in front of the van as they traveled to San Leandro. Once they arrived at the San Leandro location, defendant and his coperpetrator searched the van and then directed Martinez to throw away paperwork. It also appeared to Martinez that after defendant and Rhodes searched the van, they were looking at something, but Martinez could not see what it was. Based on this evidence, a reasonable jury could find that defendant formed the intent to steal the van before or during his use of force against Billings. As explained in *People v. Johnson* (2015) 60 Cal.4th 966, where the defendant entered the victim's home, killed her, and then took her car from the garage, "[t]he jury could readily conclude defendant intended to steal when he entered the victim's house with a weapon and beat her to death. It did not have to conclude he killed the victim for no apparent reason and only then decided to steal. When one kills and then takes substantial property from the victim, a reasonable jury can ordinarily find the killing was for the purpose of taking the property." (*Id.* at pp. 971, 988; see *People v. Gomez, supra*, 192 Cal.App.4th at p. 622 [act of

9

taking a car by one who steals the keys can imply that the key thief intended to steal the car when the thief took the keys].)

We reject defendant's claim there was insufficient evidence to support his conviction for carjacking and first degree murder under a felony-murder theory based upon carjacking. Accordingly, we need not consider defendant's argument that his murder conviction must be reversed because there is a reasonable probability that the jury relied upon the allegedly unsubstantiated felony-murder theory.

## II.    *Unanimity Instruction*

Defendant argues that the trial court erred in instructing the jury with CALCRIM No. 548 and failing to instruct with CALCRIM No. 3500 (unanimity instruction). He claims his constitutional rights were violated by the failure to instruct the jury that they needed to be unanimous as to the theory of first degree murder. However, his argument is based upon his claim that the felony-murder theory was unsubstantiated because there was insufficient evidence to establish the intent element of carjacking. It is well settled that a unanimity instruction is not required where a defendant is charged with first degree murder under alternative theories of premeditation and felony murder. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 44 [declining to reconsider settled precedent holding, " ' "[A]s long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty" ' "].) As discussed *post*, we find sufficient evidence supports defendant's conviction for carjacking. Accordingly, as defendant recognizes, where there is sufficient evidence on both theories of first degree murder, the lack of a unanimity instruction does not require reversal. (*People v. Jennings* (2010) 50 Cal.4th 616, 639.)

**III.** ***Codefendant's counsel's actions did not result in grossly unfair trial or violate defendant's due process rights.***

Defendant's final argument is that reversal is required because Rhodes's counsel acted as a "second prosecutor" in their joint trial, which made defendant's trial grossly unfair and violated his due process rights. Defendant acknowledges that this case involved defendants charged with common crimes and involved common events and victims and was thus a " 'classic case' " for a joint trial. (§ 1098; *People v. Flinner* (2020) 10 Cal.5th 686, 713.) Defendant did not move to sever his trial from codefendant Rhodes, and he does not contend that the trial court erred in failing to sever the trials or that trial counsel was ineffective for not requesting severance. Instead, defendant argues that his claim is cognizable on appeal because even when joinder is proper before evidence is presented, a reviewing court may still reverse a conviction where, because of joinder, " ' " 'a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law.' " ' " (*People v. Flinner*, at p. 713.)

As explained in *People v. Rogers* (2006) 39 Cal.4th 826, 851, while some appellate courts have reached the merits of a defendant's constitutional arguments even when no motion to sever was made, the California Supreme Court has never held that review for gross unfairness is available in the absence of a motion to sever. We find that even assuming such review is available, defendant has not established any gross unfairness or due process violations resulting from joinder.

Defendant complains that Rhodes's counsel implicated defendant during his opening statement by telling the jury that defendant and Martinez were in contact before and after the homicide and that they planned the

11

murder with others.[5]  He further complains that Rhodes's counsel's cross-examination of Officer Moriarty "assumed the ultimate fact that [defendant] had been using the 6455- number [*sic*]" and that defendant was present before, during and after the murder.  Rhodes also offered a cell phone expert who testified that the 6455 phone was in Oakland on July 26th at 2:37 a.m. and traveled to San Leandro by 3:03 a.m.  Defendant acknowledges that objections were sustained as to many of codefendant Rhodes's exhibits but states, without further analysis, that "they were, nonetheless, effectively used to spotlight [defendant] as the shooter."  Finally, defendant complains that Rhodes's counsel's closing argument emphasized that defendant, Martinez, Marcello M., and Devon B. made over 100 phone calls to each other over a two-day period and stated that they were a "clique" planning the murder.[6]

---

[5] One example from Rhodes's counsel's opening statement is when he discusses the surveillance video of the shooting and states:  "Then in the video you see that initially an unknown man, average size, apparently walking up to Billings' van.  At 2:50:37 you see a man limp up the van. 2:50:54 Martinez gets out of his car.  He opens the door, and he stands there, and he watches the murder go down.  2:51:13 Martinez picks up Haynes in the car after the final shot.  Martinez leads the way past 98th.  The van follows Martinez to [Marcello M.'s] apartment in San Leandro.  Haynes calls [Marcello M.] seven times."  (*Sic.*)

[6] Rhodes's counsel stated in his closing argument:  "You may recall from my opening statement that I presented you with a timeline of the phone calls, more than 100 phone calls between four men—Martinez, Haynes, [Devon B.], and [Marcello M.]—over the course of a two-day period, and you are going to see those calls are not random.  This is a matter of something that is being planned, something that is likely been [*sic*] festering for quite a while.  Just exactly what the issue was is not entirely clear, but we do know that these are dope dealers with a heroin run with four ounces of heroin."  He further argued, "[W]e got [Devon B.], we got Terrell Martinez, [Marcello M.], and Damone Haynes.  That's a clique, you know.  That's a group of people that have known each other since high school.  Anthony Rhodes is not part of

12

Our Supreme Court has rejected the "second prosecutor" argument advanced by defendant in cases where there are actual conflicting defenses[7] and has found that "[s]imply because the prosecution's case will be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 379.) "[W]hen there is sufficient independent evidence of the defendants' guilt, the actual presentation of conflicting defenses at trial does not reduce the prosecution's burden or otherwise result in gross unfairness." (*Id.* at p. 380.) Here, there was independent evidence supporting defendant's conviction, including Martinez's eyewitness testimony and testimony that the cell phone number the police associated with defendant was found in the house where defendant was arrested. Rhodes's counsel's references to cell phone records for the phone number associated with defendant did not reduce the prosecution's burden or make defendant's trial grossly unfair. Much of what defendant complains of were statements Rhodes's counsel made during opening statements and closing arguments. The jury was instructed that statements and argument of counsel are not evidence. (CALCRIM Nos. 104, 200.) We presume the jury followed the trial court's instructions. (*People v. Flinner, supra*, 10 Cal.5th at p. 717.) Further, Rhodes's counsel clarified during his argument that a phone number is not necessarily a proxy for a person, but that he assumed defendant possessed the phone with the 6544 number. Similarly, when he cross-examined Officer Moriarty, Rhodes's counsel referred to the phone number that Officer Moriarty "associate[ed]

---

this clique. He's not someone they're going to share information with about committing a homicide."

[7] Rhodes and defendant did not have conflicting defenses where they each asserted the other was alone culpable. Rather, they both argued that the phone records did not prove who was using the phones.

13

with [defendant] . . . ."  Nor did Rhodes's cell phone expert's testimony regarding the location of the 6544 phone violate defendant's rights.  The People's cell phone expert and investigating police officer testified to the same information.

As the California Supreme Court explained in *People v. Jackson* (1996) 13 Cal.4th 1164, when it rejected a similar "second prosecutor" argument, "[The defendant] does not identify any evidence elicited by [the codefendant's] counsel that would have been inadmissible at a separate trial.  The mere fact that a damaging cross-examination that the prosecution could have undertaken was performed instead by codefendant's counsel did not compromise any of defendant's constitutional or statutory rights."  (*Ibid.*; *People v. Flinner, supra*, 10 Cal.5th at p. 716 [" 'no denial of a fair trial results from the mere fact that two defendants who are jointly tried have antagonistic defenses' and one offers evidence 'that is damaging to the other and thus helpful to the prosecution' "].)

Defendant has not established that the action of Rhodes's counsel caused defendant's trial to be grossly unfair or violated defendant's due process rights.

## DISPOSITION

The judgment is affirmed.

Jackson, P. J.

WE CONCUR:

Simons, J.
Burns, J.

A163965/*People v. Damone Haynes*

14